Turney, J.,
delivered the opinion of the court.
The bill in this case is filed by Gilbert, to set ■aside a sale of the interest of Hunnewell, Moores & Heiskill in a mercantile establishment in the city of Memphis, the business being that of selling chinaware, glass, etc.
The relief is sought on the. ground of fraudulent misrepresentation of the value of the interest sold; *291 to-wit, the interest of said Hunnewell, Moores & Heis-kill in said concern.
In the view we have taken of this case, an elaborate discussion of the facts of the record is unnecessary. A brief statement is sufficient to raise the -question on which the case must turn.
The purchase was made in January, 1867. The complainant’s deposition was taken, in which he stated -that he believed that the statements and representations made to him were correct in scarcely any particular, and that he had remarked so to his father’s family as well as to others. That very shortly after he became a member of the firm of Eastland & Gilbert, he found cause to believe there were many goods entered on the books that were put down at much above their value, or that were never in the house, and that many names on the books were fictitious; also that accounts had been settled and no mention of this made on the books; and that he remembered to have asked Mr. Martin, the book-keeper, in regard to it, who declined to answer.
It further appears from this deposition that an account of stock was taken after the complainant’s purchase, but he is careful to say that' he did not cause it to be taken: yet it was done, but whether correctly or not, he says he does not know. He adds, that Eastland, his partner, represented everything as being perfectly correct; and then he closes this answer by the remark, as we understand him to mean, that business being so good, he saw no use in looking very carefully into the matter.
*292 Now, after all this and much more, he continued the business, selling out the stock and collecting the-debts; and he actually paid his notes for $24,000 to-the defendants, using $12,000 worth of the stock on hand in making this payment, and paying another debt of $5,000 to Anderson, who had been of the firm but had retired.
In addition to this, he continued in the business about seventeen months, and during the time put the-stock of Eastland & Gilbert into a new firm, which seems to have done business for some six or seven-months ; and, at last, after the stock purchased had been induced to about $15,000, and an assignment of' the assets had been made by Eastland, his partner, he then filed this bill for a rescission of the contract,, seeking to ■ set up the alleged fraud and misrepresentation as to the amount of stock and the value of the interest purchased by him.
The simple question is, whether, on settled and. established principles, this can be allowed by a court ‘of equity.
The rule is thus laid down in Story on Contracts,. 2d ed., sec. 497:
“ It is solely at the option of the party upon Avhom the fraud is practiced, whether he will be bound by the agreement or not. Yet if he determine to avoid a contract because of the fraud, he-must give notice of such determination -to the other party within reasonable time after his discovery of the fraud; and if, with a knowledge of the fraud, he acquiesce in the contract expressly, or do any act *293 importing an intention to stand by it, or remain silent under. circumstances which plainly indicate a continuing assent thereto, he cannot afterward avoid it; for practically no man is injured if he know of the deceit which is practiced and consent to it, since the deceit then becomes an agreed fact of the case. So, •also, if he treat the subject-matter as his own, by selling or leasing, he cannot avoid the contract on the ground of fraud, even although he should after-wards discover some new incident to the same fraud, making it more to his injury than he supposed.”
And in Doggett v. Emerson, 3 Story, 740, cited in the note, Mr. Justice Story, after remarking upon the •effect of lapse, of time in raising an obstacle to relief in cases of fraud, says: “And, a fortiori, where the party complaining has been fairly put upon his diligence, and has had ample means of inquiring as to all the material facts, and has chosen to lie by in gross indifference and indolence,” will relief be denied him.
The case of Knuckolls v. Lea, 10 Hum., 577, is in its facts very much such a case as the one before ms. In that case, the misrepresentation complained of in the bill was, that Knuekolls, knowing nothing of the income yielded by the mill purchased from Lea, had relied wholly on . the statements made by Lea upon this subject, and was thereby induced to believe that the annual value was about $2,000, whereas in fact that the real income was not nearly half this sum. The complainant then charged that, after discovering this fraud, in order to avoid a law *294 suit, he had gone on and paid two of the notes given for the purchase money. The court said, announcing substantially the principles we have stated above, that the complainant had come too late: that he should have sought this remedy as soon as he ascertained that it was needed in order to do justice to himself. That he should not have waited until he was threatened with a suit on one of the notes.
It further appeared in that case that the complainant had, after his bill was filed, sold and conveyed the premises, although he had afterwards obtained a reconveyance; and the court held that the sale was. an express ratification of the contract.
This holding of our own court has been repeatedly recognized; has stood for years unquestioned; and is soundly based upon the analogies of the law. We-cannot overrule it without some clear demonstration of its unsoundness. This has not been, and in our opinion cannot be, given.
The case before us comes palpably within the ope-ration of these principles.
The complainant, admitting his own statement to be correct, has, after having been put on his diligence by such facts as he states, continued to treat the-property as his own; has gone on to pay the purchase money; has exhausted the subject-matter of the-purchase, reducing it from perhaps forty or fifty thousand dollars, or even more, to fifteen thousand dollars; and then, after the concern in his hands has proved a failure, probably by his reckless misconduct, extravagance, and want of attention to the business (cer-- *295 tainly this result being largely aided thus), he comes and asks to be relieved from his contract.
That his extravagance has contributed much to his ruin, is shown by the fact that, though an unmarried man, he appears to have drawn out of the concern upwards of $8,000 for personal expenses, in about, seventeen months or less time.
This certainly makes a case of ratification of the contract under the above rule, which estops the complainant, and must repel him, even assuming that the fraud complained of is clearly made out, and that he stands in an attitude to invoke the aid of a court of equity in his behalf upon the grounds charged in his bill sustained by clear proof. 1 It is proper to say,, however, that, while there is abundant material in this-record upon which to base the able and ingenious arguments made by counsel in support of the truth of the alleged fraud, yet it is not by any means clear that such a cáse as is urged is made out by the proof against these defendants. We need not, however, discuss this aspect of the case at any length.
There is another fact to be gathered from the-deposition of the complainant himself. It thence appears that he had the means of investigating the state of the case for himself. His father had employed an attorney to assist him and to guard his interest, and thi.s attorney proposed to be faithful to his trust and to make a full examination of the condition of the business; but he was prevented by Gilbert from doing so.
The reason for this conduct, as may be gathered *296 from facts shown by Gilbert, was that Eastland stated to him that if such an investigation was had it would show that the concern was worth from $10,000 to $11,000 more than the price at which it was offered, and thereby this sum would be lost, whereas, by closing the trade at once, it might be made, by way of profit, at the expense of the vendors, the defendants. This is the substance of his statement.
In this view of the case, if the complainant, with the purpose of gaining this large sum, and thus driving a good bargain, refused to examine facts open to his investigation, and afterward found that in his eagerness to make $11,000 he had been the loser, and had been misled by want of knowledge of the facts of the case, he has only himself to blame, and does not stand in a position to invoke the aid of a court of equity to relieve him from the consequences of his own folly, the result of wilfully blind cupidity.. He has but overreached himself, and must/ bear the consequences. Courts of equity, in the language of Mr. Story, Eq. Jur., vol. 1, sec. 200, a, do not sit for the purpose of relieving parties, under ordinary circumstances, who refuse to. exercise a reasonable diligence or discretion.
In answer to the argument that Gilbert' was very young, — only about twenty-one years old, — it is sufficient to say that in all this matter ,he was assisted and guided by the advice of his father, who appears to have been a man of experience and business capacity.
It is proper to add, that after a careful examina *297 tion of this record we do not find satisfactory proof of the fraud so earnestly contended for by counsel against the defendants. Whether Eastland was corrupt, or was only misled, is not important to inquire, as we think the proof by a large preponderance shows that in negotiating the trade he was acting as the agent and friend of Gilbert, and not in the interest of the other defendants; and the probability is that if there was- any deception practiced, they were as much misled as Gilbert as to the precise situation of the firm. We need, however, express no definite opinion upon the evidence as to the real state of the case, farther than to say that the reckless carelessness and extravagance of Gilbert, the shrinkage of values and general depression of trade, and the large amount of insolvency that in this section of the country followed the subsidence of the excited state of markets upon the close of the war, may in a great degree account for the failure of this firm, and the financial ruin brought on its members, without the aid of the fraud alleged, as to the amount of stock on hand or of the other assets of the firm.
Without discussing at length the various questions argued with so much ability and earnestness before us, it suffices to say that we have given them a careful examination, and that our conclusion is as above set forth. The result is that the decree of the Chancellor must be affirmed, with costs.